IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ADRIAN BELSER,
    Plaintiff,

v.                                        Case No.  5:12cv49/CJK

MICHAEL J. ASTRUE,
Commissioner of Social Security,
    Defendant.

## MEMORANDUM AND ORDER

This case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Adrian Dwayne Belser's application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83.  Mr. Belser will be referred to by name, as claimant, or as plaintiff.  The parties have consented to Magistrate Judge jurisdiction, pursuant to 28 U.S.C. § 636(c), and FEDERAL RULE OF CIVIL PROCEDURE 73, for all proceedings in this case, including entry of final judgment.  (Docs. 6 & 7).  Upon review of the record before this court, I conclude that certain findings of fact and determinations of the Administrative Law Judge (ALJ) are not supported by substantial evidence.  The decision of the Commissioner, therefore, will be vacated and remanded for further proceedings.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied by the ALJ. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at 1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing

court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d. 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[1] The recitation of medical and historical facts of this case, as set out below, is based upon my independent review.

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 416.920(a)-(g), the Commissioner analyzes a supplemental security income disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of

---

[1] The Eleventh Circuit speaks not only of independent review of the administrative record, but reminds us it conducts de novo review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

*Case No:* 5:12cv49/CJK

at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent him from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, he is not disabled.

In this case, the ALJ concluded the inquiry at the second step, finding claimant does not have a severe impairment or combination of impairments. Claimant bears the burden of establishing a severe impairment that keeps him from performing him past work. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). If the claimant does not have a severe, medically determinable impairment or combination of impairments, he is not disabled. *See* 20 CFR § 416.920(c) ("If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.").

## FINDINGS OF THE ALJ

In the written decision the ALJ made a number of findings relative to the issues raised in this appeal:

1. The claimant has not engaged in substantial gainful activity since April 15, 2008, the application date.

2. The claimant has a medically determinable impairment–hypertension, controlled with medication and no functional limitations.

3. The claimant does not have an impairment or combination of impairments that significantly limits, or has so limited, the ability to perform basic work-related activities for twelve consecutive months. The claimant does not, therefore, have a severe impairment or combination of impairments.

4. The claimant has not been under a disability, as defined by the Social Security Act, since April 15, 2008.

T. 12-16.[2]

On review of the decision, plaintiff argues that substantial evidence does not support the finding that he does not suffer from a severe impairment. (Doc. 11, p. 2). In particular, plaintiff argues that his hypertension is a severe impairment, and that his anxiety is a medically determinable impairment. (Doc. 11, pp. 8-13). Based upon these assertions, plaintiff concludes that the ALJ erred by concluding that plaintiff has not been under a disability for at least twelve consecutive months.

### FACT BACKGROUND AND MEDICAL HISTORY

This section will focus on the evidence involving hypertension and anxiety, as that is where plaintiff places his focus. The ALJ begins his review of claimant's medical records as to hypertension with claimant's hospitalization in October 2007 for hypertension. T. 12. Plaintiff also starts his medical review with the "hypertensive crisis" of October 2007. (Doc. 11, p. 9).

---

[2] The administrative record, as filed by the Commissioner, consists of eleven volumes (doc. 8-2 through 8-12 ), and has 485 consecutively numbered pages. References to the record will be by "T." for transcript, followed by the page number.

On October 1, 2007, Mr. Belser presented to Northwest Florida Community Hospital in "severe hypertensive crisis." T. 290. In the emergency room, claimant had an episode of atrial fibrillation with uncontrolled hypertension. T. 290. A nuclear stress study was positive for borderline ejection fraction, suspected scarring on the inferior wall, and possible single vessel disease. T. 289. Claimant tolerated the study, and was asymptomatic other than shortness of breath and fatigue. T. 290. While in the emergency room, plaintiff had a nitroglycerin drip which controlled the crisis. T. 275. Plaintiff told Dr. Samuel Ward that he uses blood pressure medicine "just once or twice a week." T. 275. Upon discharge, Dr. Ward assessed the hypertension as "resolved." T. 275. Dr. Ward advised claimant to continue home medications as directed and to maintain a low sodium diet. T. 275.

Claimant again entered the hospital on February 6, 2008, with elevated blood pressure. T. 256. Blood pressure was controlled by the time of discharge the next day. T. 256. The chart notes plaintiff had not taken his medicine for three to four days. T. 257. The admission note also says, "He has been noncompliant in the past with his medication for his high BP. T. 257.

Dr. Mohammad Yunus did an initial history and physical examination on April 21, 2008. T. 348-349. Dr. Yunus noted blood pressure is uncontrolled "with multiple medications," and the Toprol was doubled. The doctor also added Hydralazine. T. 349. At a follow-up visit on May 14, 2008, blood pressure was 136/76, and noted as "better controlled." T. 347. Dr. Yunus continued to diagnose severe essential hypertension. T. 347.

On June 13, 2008, Dr. Yunus recorded blood pressure of 192/124. T. 346. Claimant stated that "when he has the patch and takes all his BP meds, he has good

control." T. 346. Dr. Yunus noted the patient needs monthly refills. T. 346. Claimant's blood pressure on July 11, 2008 was at 213/113. T. 345. Claimant stated, however, that blood pressure had been "controlled at home." T. 345.

On August 11, 2008, and September 11, 2008, plaintiff's blood pressure was quite high, and Dr. Yunus continued to assess severe hypertension. T. 336, 344. At the September 11 visit, Dr. Yunus charted that claimant had just taken his blood pressure medication. T. 336. In a letter to Social Security dated September 17, 2008, Dr. Yunus observed, "Pts B/P is constantly elevated, which effects his work and all other aspects of daily living." T. 335. Previously, on April 21, 2008, Dr. Yunus wrote a brief report stating, with regard to claimant, "His conditions, that include Severe Hypertension, and COPD warrant him currently unsuitable for any type of employment." T. 362.

In November 2009, plaintiff again entered Northwest Florida Community Hospital. T. 444-445, 242. Blood pressure was elevated, and plaintiff reported he was taking Clonidine at home. T. 444. Additional Clonidine, administered in the emergency room, lowered the blood pressure. T. 444. Upon discharge on November 25, the chart shows blood pressure was controlled while in the hospital. T. 242. The discharge physician took note that plaintiff's Hydralazine "might bottom him out," so the doctor prescribed other medications for the hypertension. T. 242. Plaintiff was advised to take his Clonidine and check blood pressure one hour later. T. 242.

Dr. Abdel Bayoumy assumed care of Mr. Belser in May of 2009 and provided treatment until July of 2010, or right up to the time of the ALJ hearing. T. 370-443. At the initial visit, claimant's blood pressure was 220/158. T. 372. In a later entry, Dr. Bayoumy noted hypertension as "controlled," T. 374, but subsequently, the

doctor stated that hypertension was uncontrolled. T. 388, 390. On later visits, however, the blood pressure status returned to "controlled" with medication. T. 392, 394, 396, 398, 400, 408. The chart does note uncontrolled blood pressure on some occasions, and on one of those visits, the doctor appears to have noted patient was off medication for a "couple days." T. 410. Back on Clonidine, and weeks later, claimant's blood pressure was at 134/82. T. 412.

Concerning mental status, George Horvath, Ph.D., performed a clinical evaluation on June 16, 2008. T. 300-302. Mr. Belser had no history of treatment for mental health issues. He said that a couple of weeks earlier, he had become "anxious and afraid." T. 300-301. Dr. Horvath found claimant had normal attention and concentration, was cooperative, and had depressed mood and flat effect. T. 301. Intelligence and fund of knowledge appeared average. T. 301. Although diagnosing anxiety and adjustment disorders, Dr. Horvath saw "no psychological reasons why [claimant] cannot work." T. 302. A state agency consultant found a documented medically determinable impairment. T. 308, 315. The same consultant characterized the impairment as "not severe." T. 303. This examiner noted in a statement to a Social Security examiner, that claimant had no mental health difficulties that would interfere with the ability to return to work. T. 315.

The Psychiatric Review Technique, completed by James L. Meyers, Psy.D., also found a consistent pattern of findings characteristic of adjustment disorder with depressed mood and anxiety disorder. T. 332. According to Dr. Meyers, the "consistent pattern of findings [is] characteristic of this type of [medically determinable impairment]." T. 332. Dr. Meyers found no restrictions of activities of daily living attributable to mental health. T. 332.

Mr. Belser testified on his own behalf at the ALJ hearing, which took place in July of 2010. T. 30-50. Sometimes he can't tell when his blood pressure goes up. The noticeable symptoms of his high blood pressure include chest tightness, nausea, and palpitations. T. 33-34. If he is real calm, "not too active," he can keep his pressure more stable. T. 36. He has noticeable episodes about every two weeks. T. 37. The hypertension affects his energy level, and he takes regular B-12 shots for fatigue and exhaustion. T. 38-39. Claimant uses Xanax, an anti-anxiety medication, in an attempt to keep himself calm, so as not to acerbate the blood pressure issue. T. T. 39-40. Sometimes the blood pressure leads to blurred vision, to the extent claimant cannot "read the writing you have on the paper." T. 40.

## ANALYSIS

At step two of the sequential analysis, 20 C.F.R. § 416.920(a)-(g), the ALJ must determine whether the claimant has a severe impairment that keeps her from performing her past work. *See* 20 C.F.R. § 1520(c). The burden at this step is on the claimant. *See Chester,* 792 F.2d at 131. As to "severe impairment," the Commissioner's Regulations provide:

> **What we mean by an impairment(s) that is not severe.**
>
> (a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
>
> (b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--
>
>> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

      (2) Capacities for seeing, hearing, and speaking;

      (3) Understanding, carrying out, and remembering simple instructions;

      (4) Use of judgment;

      (5) Responding appropriately to supervision, co-workers and usual work situations; and

      (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521. The Commissioner has adopted an interpretive ruling that specifically addresses how to determine whether medical impairments are severe. The ruling provides in part:

> As explained in 20 CFR, sections 404.1520, 404.1521, 416.920(c), and 416.921, at the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA [substantial gainful activity]. An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). Thus, even if an individual were of advanced age, had minimal education, and a limited work experience, an impairment found to be not severe would not prevent him or her from engaging in SGA.

SSR 85-28, 1985 WL 56856, at *3 (1985).

As applied, the step two severity determination is a threshold inquiry used to screen out "trivial" claims, meaning an impairment is not severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984); *see also Bowen v. Yuckert*, 482 U.S. 137, 145 n.5 (1987); *Stratton v. Bowen*, 827 F.2d 1447, 1453 (11th Cir. 1987); *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). Generally speaking, a claimant needs to show only that her "impairment is not so slight and its effect is not so minimal." *McDaniel*, 800 F.2d at 1031. Emphasizing the threshold nature of the step two finding, the *McDaniel* court observed that the proper standard "allows only claims based upon the most trivial impairments to be rejected." *See id.* Accordingly, "severe impairment" is a "*de minimis* requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them from working." *Stratton*, 827 F.2d at 1452 n.9 (*quoting Baeder v. Heckler*, 768 F.2d 547, 551 (3d Cir. 1985)). Where a claimant has alleged several impairments, the Commissioner has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled. *Wilson*, 284 F.3d at 1224. This requirement is met if the ALJ states that the claimant "did not have an impairment or combination of impairments " that would amount to a disability. *Id*. at 1224–25.

Here, plaintiff argues that the medical records in evidence demonstrate the error of the ALJ's conclusion that the hypertension could be controlled with medication and posed no functional limitations. (Doc. 11, p. 8). Plaintiff further takes issue with the ALJ's focus upon "two occasions in the record" where plaintiff

said he had failed to comply with his medication regimen. (Doc. 11, p. 8). Before making a finding of noncompliance with medication, says plaintiff, the ALJ should have considered Mr. Belser's financial situation and ability to afford the required medications. (Doc. 11, pp. 8-9).

The Eleventh Circuit has explained the applicable rules, where a question of claimant's noncompliance with medical directions becomes an issue:

> The regulations provide that refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability. See 20 C.F.R. § 416.930(b). "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted); *see Epps v. Harris*, 624 F.2d 1267, 1270 (5th Cir. 1980). In order to deny benefits on the ground of failure to follow prescribed treatment, the ALJ must find that had the claimant followed the prescribed treatment, the claimant's ability to work would have been restored. *See Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987); *Patterson v. Bowen*, 799 F.2d 1455, 1460 (11th Cir. 1986). This finding must be supported by substantial evidence. *Patterson,* 799 F.2d at 1460; *see Jones v. Heckler,* 702 F.2d 950, 953 (11th Cir. 1983).

*Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988).

The Eleventh Circuit also recognizes an exception where the plaintiff cannot afford treatment or can find no way of obtaining it. *Id.* (*citing Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986)). If one's disability can be cured by treatment or compliance, yet such treatment is not financially available, the condition is disabling in fact and continues to be disabling in law. *Id.*, at n. 5. As more recently stated by the Eleventh Circuit, "when an ALJ relies on noncompliance as the sole ground for denial of disability benefits, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is

required to determine whether the claimant was able to afford the prescribed treatment." *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).

The financial inability argument holds no sway here. The claimant in *Dawkins* testified at the administrative hearing that she was unable to take her prescribed medication because she could not always afford to refill her prescription. *Dawkins*, 848 F.2d at 1213; *see also Anderson v. Astrue,* 8:11-CV-234-T-24MAP, 2012 WL 570951, at *2 n. 5 (M.D. Fla. Feb. 3, 2012) ("A distinguishing fact between *Dawkins* and the instant case is that the claimant in *Dawkins* testified at the administrative hearing that the reason for failing to take her medication was because she could not afford it."). Here, plaintiff did not seriously contend that his sole reason for noncompliance was financial. The only evidence cited in plaintiff's memorandum deals with his failure to follow up with a kidney specialist.[3] (Doc. 11, p. 6); T. 37. Moreover, the record is replete with instances where plaintiff affirmed he was using his blood pressure medications.

Going to the substance of the argument, plaintiff states that substantial evidence will not support the ALJ's finding that the hypertension was adequately controlled with medication and posed no functional limitations. T. 12. In support of this conclusion, the ALJ cited two hospital entries, October 4, 2007, and February 6, 2008, indicating noncompliance with medications. T. 12. At the October 2007 admission, Dr. Ward charted that plaintiff said he uses his blood pressure medication only once or twice a week. T. 275. The entry does not state the frequency of use that

---

[3]At the hearing, counsel asked Mr. Belser whether "there were time periods you couldn't afford to get all the medicines you needed." T. 47. Claimant responded to this direct question in an evasive manner, beginning to talk about his wife's military Tri-Care. T. 48. This evidence does not raise a serious question of financial ability.

had been prescribed. In the February entry, the doctor noted three to four days of not taking medicine and that Mr. Belser had been noncompliant in the past. T. 256.

The ALJ's finding that claimant's hypertension was adequately controlled with medication, relying as it does on these two charting entries, is not supported by substantial evidence. As for the October admission, the chart is cryptic at best, and does not identify a pattern of noncompliance, nor does it directly associate the severe hypertensive crisis, noted upon admission, with noncompliance. The ALJ's intuition in this regard, although undoubtedly in good faith, does not substitute for evidence. The reference in the February chart to past noncompliance could well have been spurred by review of the October chart, and the use by the admitting physician of the phrase "in the past" does not appear intended to refer specifically to the present situation. Dr. Ward appears to have made both entries.

Also, in November of 2009, claimant again entered the hospital. T. 242-243; 444-445. On November 25, the discharge summary notes plaintiff had been taking his Clonodine and blood pressure was fluctuating. T. 242. Upon admission, plaintiff received more Clonodine, as well as a Catapres patch and Norvasc. T. 246. The admission chart, under "Current Medications on Admission," indicates claimant was using Clonodine, Hydralazine, and Norvasc, all identified as anti-hypertensive drugs. T. 243. Evidence of record for that admission does not suggest medication noncompliance.

The medical evidence of severe hypertension is consistent throughout the chart. During hospitalizations, the blood pressure was controlled by aggressive use of multiple drugs. Two isolated charting entries, one of which may have been repetitive

of another, does not support a finding that noncompliance is the "but for" factor in claimant's severe hypertension.[4]

The ALJ order notes, "Claimant admitted on June 13, 2008, that when he takes his medication, he has good blood pressure control. Obviously, he is non-compliant." T. 17. The chart entry referenced by the ALJ was made by Dr. Yunus: "He states that when he has the patch and takes all his BP meds, he has good control." T. 340. Only one month before, however, Dr. Yunus had observed that claimant has "severe hypertension with multiple medications. Still his BP is not controlled." T. 342. The doctor added additional medication. T. 342. At the initial visit with Dr. Yunus, in April, the doctor had noted the patient has severe hypertension and has been taking multiple medications to control blood pressure. T. 343. One month after the June 13 note, Dr. Yunus' chart reflects blood pressure of 213/113, and that the patient had said blood pressure was controlled at home. T. 345. Two months after the note that gave the ALJ such pause, Dr. Yunus assessed severe essential hypertension (186/112), and made no note of noncompliance or new medications.

Allowing appropriate deference to the ALJ, the conclusion of "obvious" noncompliance is just not supported by substantial evidence. Instead, the longitudinal medical evidence strongly suggests fluctuating, and often uncontrolled, blood pressure, even with medication. Substantial evidence does not support a finding that, because claimant's blood pressure was stabilized during inpatient treatments, he should somehow be held at fault for those times when he was not

---

[4] Although not mentioned by the ALJ, I have not overlooked Dr. Bayoumy's note that the patient was off meds for a couple of days. T. 410. The same doctor's chart shows that claimant had dramatically fluctuating blood pressure.

hospitalized and his blood pressure was uncontrolled. Dr. Bayoumy's chart, the most recent evidence, shows a pattern of great fluctuation between controlled and uncontrolled blood pressure, with only one offhand comment concerning a couple of days of being off medications. In sum, although the evidence will certainly support a finding that Mr. Belser does not always take his blood pressure medicine, that does not equate in this case to willful refusal to follow medical advice. Moreover, the evidence does not support a conclusion that the limited noncompliance reflected in the record is the straw that broke the camel's back with regard to plaintiff's ability to work. *See Dawkins*, 848 F.2d at 1213 ("[T]he ALJ must find that had the claimant followed the prescribed treatment, the claimant's ability to work would have been restored."). Considering the low bar of "severe impairment" for disability purposes, the ALJ erred by not properly evaluating plaintiff's severe hypertension. Although the record clearly documents instances of medication noncompliance, these instances must be evaluated in light of the entire medical chart. The ALJ did not do that.

I find no error in the ALJ's determination that claimant's anxiety disorder has not been show to be a severe impairment. T. 15. The ALJ correctly noted that although claimant saw a consultative examiner, the record does not otherwise reflect treatment for any significant disorder. The consultant found no psychological problem that would interfere with work. Moreover, claimant's own testimony does not support a finding of a severe medically determinable mental impairment. Nevertheless, as this matter will be remanded, claimant will not be precluded from submitting new evidence of mental status, should the same be available and temporally relevant.

It is therefore ORDERED:

The decision of the defendant Commissioner is VACATED and the matter is REMANDED to the Commissioner for further proceedings. The clerk will enter judgment for plaintiff.

At Pensacola, Florida, this 10th day of September, 2012.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.
UNITED STATES MAGISTRATE JUDGE**